## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

KIMBERLY HASHWAY,

               Plaintiff,

v.

STARBUCKS CORPORATION,

               Defendant.

Civil Action No.

**JURY TRIAL DEMANDED**

## COMPLAINT

### Introduction

Plaintiff Kimberly Hashway ("Plaintiff"), by her undersigned counsel, hereby brings this complaint against Starbucks Corporation ("Defendant") based upon its negligent and/or intentional allowance of, and willful refusal to prevent or otherwise resolve, a customer's longtime wrongful and unlawful sexual harassment, discrimination, and intimidating, hostile, and abusive conduct in violation of her rights.  Over the course of her time working for Defendant, Plaintiff was subjected to vulgar, severe, and pervasive sexual harassment at the hands of a daily customer, Nicholas Bianco.

Plaintiff's complaints were ignored and her attempts to avoid Mr. Bianco were expressly forbidden by the Defendant until she was terminated based upon her complaints and attempts to avoid being sexually harassed.  Defendant's actions and omissions created a hostile work environment and constituted gender discrimination and retaliatory termination in violation of Title VII (42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e-3(a)), the Fair Employment Practices Act (R.I. Gen. Laws § 28-5-1, et seq,), and the Rhode Island Civil Rights Act (R.I.G.L. § 42-112-1, et seq.).  As a result, Plaintiff suffered severe physical and emotional distress and lost wages and benefits, and incurred medical bills.  Plaintiff seeks payment of back wages and lost

benefits, future wage and benefit loss, emotional distress damages, punitive damages, and attorneys' fees and costs based upon the Defendant's willful discriminatory and retaliatory termination and otherwise unlawful actions.  In support of this complaint, Plaintiff avers as follows:

## Parties

1.      Plaintiff is a citizen of Massachusetts and resides at 256 Olney Street, Seekonk, MA 02771.

2.      Defendant is a corporation organized under the laws of the State of Washington with a principal place of business located at 2401 Utah Avenue S., Suite 800, MS; S-LA1, Seattle, WA 98134.

## Jurisdiction and Venue

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, 28 U.S.C. § 1367(a), and 42 U.S.C. § 2000e-5(f)(3).

4.      Venue is appropriate pursuant to 42 USC § 2000e-5(f)(3) and because the complained-of conduct occurred here.

## Facts

5.       Plaintiff worked at Starbucks located in Seekonk, MA from July 2, 2012 through September 20, 2014.

6.      She then transferred to the Starbucks located at 180 Country Road, Barrington, RI 02806.

7.      She worked at the Barrington location until December 6, 2017 when she was terminated for complaining about a customer's sexual harassment and the Defendant's refusal to protect her from it.

8.      At all relevant times, Nichole Gauthier was the General Manager of the Barrington Starbucks.

9.      At all relevant times, James Alden was a shift supervisor at the Barrington Starbucks.

10.     At all relevant times, Plaintiff was employed as a "Partner" at Starbucks and generally performed the duties of a barista (i.e., taking and preparing orders and accepting payments for orders).

11.     Plaintiff had transferred from the Seekonk location to the Barrington location due to the fact that she was offered a full time schedule without having to work weekends.  This was important because Plaintiff is also a photographer and often worked weekend events.

12.     From the time she first started working at the Barrington Starbucks through November of 2016, Mr. Bianco would routinely stare at Plaintiff in a suggestive manner, linger in the Barrington Starbucks parking lot to try to speak with her, and generally make Plaintiff feel uncomfortable at work.

13.     Mr. Bianco would also often make lewd and inappropriate comments to, and attempts at physical contact with, Plaintiff.

14.     In or about November of 2016, Mr. Bianco approached Plaintiff at the counter, stared directly and suggestively at her breasts, asked, "when are you going to let me give them a squeeze," and raised his hands toward her breasts in an effort to touch them.

15.     Plaintiff left work visibly upset by this and reported Mr. Bianco's conduct that day to Ms. Gauthier who subsequently claimed to have reported it to Starbucks Human Resources called "Partner Resources."  However, Ms. Gauthier refused to take any other actions

or provide any information whatsoever regarding her purported complaint with Partner Resources.

16.     Based on the conduct of Mr. Bianco, Plaintiff began seeing a psychiatrist.

17.     Mr. Bianco continued his general conduct toward Plaintiff, including staring at her, seeking to speak with her without reason, and otherwise making Plaintiff feel uncomfortable at work.

18.     In January of 2017, Mr. Bianco again approached Plaintiff at the counter and, while staring at her breasts, stated "your left one looks out of place, let me help you fix it." He then reached to grab her breasts.

19.     Plaintiff, visibly shaken, immediately backed away from the counter and told Mr. Bianco to not go near her.  Mr. Bianco stated, "it's just a tit, I don't know what you're so upset about."

20.     Plaintiff was visibly and severely disturbed by this incident, and other incidents, and several of her co-workers immediately and throughout that shift, sought to console her.

21.     Plaintiff called Partner Resources that day to complain about Mr. Bianco's continuing behavior and the latest incident.

22.     Plaintiff was advised that Starbucks would have someone from the Barrington Starbucks "talk to" Mr. Bianco.  Plaintiff was later verbally advised that Mr. Alden had purportedly spoken with Mr. Bianco but she was never told what was said, the result of the conversation, or what actions would be taken at that time or in the event of future incidents.

23.     Plaintiff and her co-workers, who were well aware of the harassment Plaintiff was being forced to endure, formulated a plan to limit the number of interactions

Plaintiff would have with Mr. Bianco.  Every time he entered the store (which was generally every day around noon), Plaintiff would alert her co-workers to his presence, walk into the back of the Starbucks, and have a co-worker take and prepare Mr. Bianco's order.  Plaintiff would return to the front of the Starbucks after Mr. Bianco had received his order.

24.     This practice was itself extremely stressful.  Plaintiff was under constant fear that she would be caught with a customer and unable to leave before Mr. Bianco approached the counter.

25.     Moreover, even when she was successful, being forced to constantly scan the parking lot and door for sign of Mr. Bianco and then leave the front of the store almost every day took a severe emotional toll on Plaintiff.

26.     It was a near daily reminder about the way in which Mr. Bianco had treated Plaintiff and the harassment she was forced to endure.

27.     Moreover, this process did nothing to stop Mr. Bianco's stares and unwanted communications after Mr. Bianco had been given his order.  He routinely would stay in the store for some time with his order.

28.     Finally, it was undeniably apparent to Mr. Bianco as to what Plaintiff was doing every day which made the matter even more stressful.  Plaintiff was concerned that her refusal to wait on Mr. Bianco would anger him.

29.     Mr. Bianco's habit of sexual harassment and discrimination against employees continued unabated.

30.     For example, at various dates between January 2017 and November of 2017:

      a.  Mr. Bianco dropped his hands to the counter and said he wanted Plaintiff to "drop them [her breasts] into [his] hands."

5

b. Plaintiff was having a friendly conversation with another customer when, after the customer left with his order, Mr. Bianco stated, "why don't you just skip the foreplay and just fuck him."

c. When Plaintiff stopped into the store to pick up a coffee, Mr. Bianco commented about how big Plaintiff's breasts were as she walked by him.

d. Mr. Bianco initiated a conversation with Plaintiff about how they should have casual sex with each other.

e. Mr. Bianco asked Plaintiff private details about her "sex life" with someone she was seeing at the time.

31. On Monday April 17, 2017, Ms. Gauthier and Mr. Alden, both of whom were well aware of Mr. Bianco's past behavior and incidents, told Plaintiff that she could no longer avoid serving Mr. Bianco. Ms. Gauthier stated that Plaintiff was "just making it worse for everyone else."

32. On Wednesday April 19, 2017, Mr. Bianco walked into Starbucks. Because of Ms. Gauthier and Mr. Alden's order on the 17th, Plaintiff was forced to serve Mr. Bianco. For that reason, very soon thereafter, she suffered a severe panic attack in plain view of her co-workers and customers. After several minutes of uncontrollable sobbing, difficulty breathing, and other indicia of a panic attack, Ms. Gauthier, clearly annoyed by Plaintiff's panic attack, aggressively told Plaintiff to leave the store.

33. On April 20, 2017, Ms. Gauthier met with Plaintiff around 9:00 a.m. and advised her that she was not allowed to ignore "the customer" and that the situation was "interfering with [Plaintiff's] ability to do [her] job."

34. Ms. Gauthier presented Plaintiff with three (3) options: (1) serve the customer including engaging in friendly conversation; (2) change her hours to avoid the customer; or (3) transfer to the Seekonk Starbucks.

35.     None of these three options was workable.  Mr. Bianco generally arrived mid-day and sometimes several times a day, making avoiding him by changing shifts impossible.

36.     Moreover, the Seekonk location from which Plaintiff had previously transferred could not guarantee weekday or fulltime hours.

37.     Later that day, at 1:24 p.m., Plaintiff called Partner Resources which essentially confirmed the three options but also directed Plaintiff to a "specialist" to further discuss the issue.  The specialist directed Plaintiff to discuss the issue further with her District Manager, Jana Smalley.

38.     Ms. Smalley confirmed that Plaintiff's options were limited to the three set forth by Ms. Gauthier but stated that "if it happens again, he's in a lot of trouble."

39.     Despite this representation, future incidents did not lead to any tangible action on the Defendant's part.

40.     At no time did Starbucks, Partner Resources, Ms. Gauthier, Mr. Alden, or Ms. Smalley ever entertain the idea of banning Mr. Bianco from the store or otherwise ensuring that his harassment ceased or that Plaintiff would be free from a hostile work environment without having to materially alter the terms of her employment.

41.     Due to the April 19, 2017 panic attack and the lack of resolution to the issue on April 20, 2017, Plaintiff made emergency appointments with her therapist and psychiatrist for that afternoon and evening.

42.     Due to the workplace harassment and stress, including Plaintiff's panic attacks, Plaintiff was prescribed Xanax by her psychiatrist which she took every day just before noon—the approximate time Mr. Bianco would enter the store each day.

43.     Plaintiff continued to endure daily stress and anxiety each day as a result of her fear of having to wait on Mr. Bianco, the process of having to leave the front of the store, and the continuing ogling, staring, and comments directed at her by Mr. Bianco.

44.     Despite Ms. Gauthier and Mr. Alden's command that she cease doing so, Plaintiff could no longer endure the stress of waiting on Mr. Bianco so she resumed her daily practice of leaving the front of the store each time Mr. Bianco would enter and having a co-worker handle his order.

45.     Mr. Bianco's comments continued and were not directed at Plaintiff alone.

46.     Plaintiff was approached by a 17-year-old girl who told her that Mr. Bianco was "creepy" toward her and kept trying to give her "life advice."

47.     Plaintiff would often see Mr. Bianco staring at and ogling young girls in the store.

48.     In May of 2017, a male "Partner" from a different Starbucks worked a day shift at the Barrington Starbucks.  This gentleman, who was gay, wore lipstick to work and waited on Mr. Bianco.

49.     Later that day, Mr. Bianco complained to two of Plaintiff's co-workers, stating that he "doesn't pay money to have to see that fag shit in [his] store."

50.     The shift manager that day told Mr. Bianco that while he was "entitled to his opinion," that type of comment was not welcome.  She contacted Partner Resources about the incident and was told that she handled it well.

51.     However, Ms. Gauthier later determined that she "could have handled that situation differently," implying that the shift manager had been overly sensitive and too aggressive toward Mr. Bianco.

52.     That same month, Mr. Bianco had a similar incident with another male employee who was wearing a nose ring.  Mr. Bianco told him that for Mother's Day he should "take that fucking thing out of your nose" because it made him "look like a girl."

53.     Again, Partner Resources was called but no action was taken.

54.     Defendant were aware of all of these incidents and Partner Resources was contacted at least five times about Mr. Bianco by store Partners alone, plus several other purported times by Ms. Gauthier and other supervisors.

55.     In response to none of these internal complaints did the Defendant ever provide any of the complainants, including Plaintiff, with a writing detailing the disposition of the complaints.

56.     At the time of the most recent incident, Ms. Gauthier was in the middle of an extended absence from the store.  Based on that incident, several employees took this opportunity to discuss with the temporary General Manager, Emily Geradi ("Ms. Geradi"), the discriminatory comments that had taken place over the past several months including the sexual harassment that Plaintiff had endured.

57.     Based on these discussions, Ms. Geradi left a note for Ms. Gauthier and Ms. Smalley detailing the feelings of the employees (of which Ms. Gauthier and Ms. Smalley were already well aware) and agreed with the workers' conclusion that the workers should not have to endure this type of discriminatory treatment at the hands of a customer.

58.     Upon Ms. Gauthier's return, nothing changed and the note was ignored.

59.     Plaintiff continued working each day riddled with stress and anxiety about having to run into the back of the store every day when Mr. Bianco entered the store.  Plaintiff

was under constant fear of being unable to leave the floor in time to avoid Mr. Bianco and she was forced to take Xanax every day just before Mr. Bianco was due to come in.

60.     Even though she was fortunate enough to <u>mostly</u> avoid having to wait on Mr. Bianco, Plaintiff was still subjected to intense stares, creepy behavior, and comments.

61.     Because Mr. Bianco often stayed in the store to drink and eat and socialize, Plaintiff was under constant stress and fear that Mr. Bianco would approach her.

62.     Her fear was also based upon some news reports Plaintiff had read online about Mr. Bianco's multiple arrests for domestic assault and battery against his ex-girlfriend.

63.     Plaintiff was afraid about angering Mr. Bianco and therefore, her daily life involved her striking a delicate balance between avoiding sexual harassment, not angering Mr Bianco, and keeping her job.

64.     Eventually, in early October of 2017, Mr. Alden again became frustrated with Plaintiff having to leave the floor every time Mr. Bianco walked into the store. He raised this issue with Ms. Gauthier who, while clearly frustrated and annoyed, approached Plaintiff and stated that they needed to "talk about this issue."

65.     Plaintiff continued leaving the floor of the store to Ms. Gauthier and Mr. Alden's irritation.  Plaintiff did not know what other action to take in order to avoid serving Mr. Bianco and enduring his likely harassment.

66.     Ultimately, the complaints about the harassment and Plaintiff's continued attempts to avoid waiting on Mr. Bianco drew the increased ire of the Defendant.

67.     As such, in late October 2017, because Plaintiff was several minutes late for work, Ms. Gauthier issued her a write-up.  She also wrote her up based on her claim that Plaintiff was out of dress code because her shirt "looked like" a t-shirt (which were not allowed)

and her grey sneakers had a pink check mark on them (only grey sneakers were allowed to be worn).

68.     Plaintiff had worn these articles of clothing numerous times and had never received a comment or write up before.  Moreover, co-workers who were less than fifteen minutes late were never written up.

69.     While handing Plaintiff the write-up, Ms. Gauthier commented that Plaintiff should not worry because the write-up was "just a formality" and if Plaintiff was late again she "was not going to fire" her.

70.     At this time, Ms. Gauthier also raised the issue of Mr. Bianco and told Plaintiff that she could not leave the floor when he walked in unless "business permits."

71.     Plaintiff continued having to leave the floor every day when Mr. Bianco walked in and take her prescribed anti-anxiety and panic disorder medication just before he entered the store.

72.     Alerting co-workers almost every single day when Mr. Bianco arrived and then quickly exiting the floor before he reached the counter was an extremely cumbersome, stressful, and onerous process that significantly altered the terms of Plaintiff's employment.

73.     Every day, Plaintiff was filled with stress and anxiety at the thought of what she would have to do immediately upon seeing Mr. Bianco.

74.     Plaintiff would also be forced to constantly stare at the door and out the windows to ensure that she saw Mr. Bianco approaching and would have enough time to finish whatever she was doing, alert her co-workers that she had to leave, and rush to the back of the store.

75.     On November 29, 2017, Plaintiff was unable to exit in time and was forced to wait on Mr. Bianco.  Mr. Bianco aggressively and purposefully stared directly at Plaintiff's breasts.  The stare was so evident and obvious that it must have been an intentional attempt to harass and demean Plaintiff at her place of employment.

76.     At this point, Plaintiff could no longer tolerate her unpermitted arrangement and the stress involved with having to run from the floor almost every day when Mr. Bianco arrived.

77.     Moreover, she could certainly no longer tolerate the treatment she was receiving from Mr. Bianco as described above.

78.     As such, later that afternoon, Plaintiff text messaged Ms. Gauthier that: "I swear to God, if I catch that creep staring at me again, I am going to rip his eyes out."

79.     Ms. Gauthier, feigning ignorance of the situation about which she had constantly been made aware by multiple employees, replied, "huh? Who?"

80.     Plaintiff responded with a nickname several Starbucks employees had given Mr. Bianco: "sexual harassment turtle."

81.     When Ms. Gauthier again feigned ignorance about to whom Plaintiff was referring, Plaintiff asked if Ms. Gauthier had ever heard the employees call Mr. Bianco by that name.  Ms. Gauthier responded, "nope," and ceased text messaging.

82.     One week later on December 6, 2017, Plaintiff timely arrived at her scheduled shift at 4:45 a.m. and was greeted outside by Ms. Gauthier who advised Plaintiff that she had been 15 minutes late for her shift two weeks earlier sometime between November 20, 2017 and November 22, 2017 and, as such, she was terminated.

83.     Plaintiff had explained her tardiness on the day of that shift.  She had set her alarm for 3:30 a.m. under the mistaken assumption that she was scheduled to work at 4:45 a.m. and had forgotten to reset her alarm for the 8:30 a.m. shift.

84.     Plaintiff had worked numerous times with Ms. Gauthier since that shift and Ms. Gauthier had never discussed the issue or provided any written or verbal warning/write-up.

85.     During Plaintiff's first four years of working for Defendant, she had been written up only twice for tardiness: September of 2012 and September of 2016.  During these instances, Plaintiff had been tardy by twenty-two and forty minutes.

86.     Ms. Gauthier's practice had been to only issue write-ups for tardiness after an employee was late more than 15 minutes.

87.     After Plaintiff began complaining to Ms. Gauthier and Defendant about the sexual harassment, she was issued a write up for being less fifteen minutes late and terminated for being fifteen minutes late.

88.     Moreover, write-ups for being late to shifts were usually issued within days of the violation.  It never took two weeks for a supervisor to issue a write-up or otherwise punish a violation.

89.     It is clear that Plaintiff was terminated because of her complaints about Mr. Bianco, her complaints about the fact she was forced every day to leave the floor when he arrived, and the fact that this daily process was not sanctioned by Defendant.

90.     Plaintiff had worked at Starbucks for over five (5) years and generally had excellent performance reviews and was well-liked by her co-workers.

91.     The harassment endured by Plaintiff was so severe and pervasive that it altered the conditions of Plaintiff's employment and created a work environment abusive to Plaintiff.

92.     The harassment at issue was objectively and subjectively offensive.

93.     Moreover, Defendant forced Plaintiff to accept the sexual harassment in exchange for being able to keep her job.

94.     The sexual harassment at issue and Defendant's reaction to it created a workplace that was permeated with discriminatory intimidation, ridicule, and insult.

95.     The Defendant knew about the harassment at issue but did not take adequate steps to address it.  In fact, they refused to accommodate Plaintiff's sole, and woefully inadequate, potential resolution: refusing to personally wait on Mr. Bianco.

96.     Rather, the Defendant put the onus on Plaintiff to deal with the harassment, change hours or locations, or violate direct orders from her supervisors and continue hiding in the back of the store every time Mr. Bianco was present.

97.     Because of the discrimination, retaliation, and harassment against Plaintiff, she has been significantly injured.

98.     The harassment by Mr. Bianco and treatment by Defendant caused Plaintiff significant emotional, physical, and mental harm including the need for psychiatric care and a prescribed anti-anxiety and panic disorder medication which she was forced to take every day just before Mr. Bianco would arrive at the store.

99.     Moreover, Plaintiff was ultimately terminated as a result of her continuous complaints about the harassment.

100.     As a result of the Defendant's actions detailed herein, including the

termination, Plaintiff has suffered damages including loss of pay, loss of benefits, emotional distress, and humiliation.

101.    The actions by the Defendant as detailed herein were intentional, arbitrary, unreasonable, tortious, willful, wanton, reckless and in bad faith.

102.    On or about January 2, 2018, Plaintiff filed a verified charge with the Rhode Island Commission for Human Rights (the "RICHR Charge").  A true and accurate copy of the RICHR Charge is attached hereto as Exhibit 1.

103.    The Commission investigated Plaintiff's claims and, on November 27, 2018, a Preliminary Investigating Commissioner issued a determination that there was probable cause to believe that the Defendant violated the Rhode Island Fair Employment Practices Act (the "Determination of Probable Cause").  A true and accurate copy of the Determination of Probable Cause is attached hereto as Exhibit 2.

104.    On January 16, 2019, the Commission issued a notice of right to sue (the "RICHR Notice of Right to Sue") terminating the proceedings before the Commission and authorizing Plaintiff to file suit under state law.  A true and accurate copy of the RICHR Notice of Right to Sue is attached hereto as Exhibit 3.

105.    On February 20, 2019, the Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights (the "EEOC Notice of Right to Sue") terminating proceedings before the EEOC and authorizing Plaintiff to file suit under federal law.  A true and accurate copy of the EEOC Notice of Right to Sue is attached hereto as Exhibit 4.

## COUNT I
### (Fair Employment Practices Act – R.I. Gen. Laws § 28-5-1, *et seq.*)

106.    Plaintiff repeats and realleges Paragraphs 1-105 as if set forth in full herein.

107.   Plaintiff is an employee as that term is defined by R.I. Gen. Laws § 28-5-6.

108.   Defendant is an employer as that term is defined by R.I. Gen. Laws § 28-5-6.

109.   It was an unlawful employment practice for Defendant to negligently and/or intentionally allow, and willfully refuse to prevent or otherwise resolve, a customer's longtime wrongful and unlawful sexual harassment, discrimination, and intimidating, hostile, and abusive conduct in violation of her rights.

110.   It was an unlawful employment practice for Defendant to discriminate against Plaintiff because she opposed practices forbidden by the Fair Employment Practices Act and otherwise complained to Defendant about her harassment and its refusal to take any actions.

111.   It was an unlawful employment action for Defendant to fail to disclose to Plaintiff in writing the disposition of her internal complaints alleging harassment in the workplace on the basis of gender.

112.   As a result of these actions undertaken by the Defendant, as described herein, Plaintiff has suffered and continues to suffer damages.

## COUNT II
### (RI Civil Rights Act of 1990 – R.I. Gen. Laws § 42-112-2)

113.   Plaintiff repeats and realleges Paragraphs 1-112 as if set forth in full herein.

114.   Defendant discriminated against and terminated Plaintiff because of her gender.

115.    Defendant negligently and/or intentionally allowed, and willfully refused to prevent or otherwise resolve, a customer's longtime wrongful and unlawful sexual harassment, discrimination, and intimidating, hostile, and abusive conduct in violation of her rights.

116.    As a result of these violations of law as described herein, Plaintiff has suffered and continues to suffer damages.

## COUNT III
## (Title VII of the Civil Rights Act of 1964 - 42 U.S.C. § 2000e-1, *et seq.*),

117.    Plaintiff repeats and realleges Paragraphs 1-116 as if set forth in full herein.

118.    Defendant is an employer as that term is defined by 42 U.S.C. § 2000e-1.

119.    Plaintiff is an employee as that term is defined by 42 U.S.C. §2000e-1.

120.    Defendant discriminated against and terminated Plaintiff because of her gender and because she opposed unlawful employment practices.

121.    Defendant negligently and/or intentionally allowed, and willfully refused to prevent or otherwise resolve, a customer's longtime wrongful and unlawful sexual harassment, discrimination, and intimidating, hostile, and abusive conduct in violation of her rights.

122.    As a result of these violations of law as described herein, Plaintiff has suffered and continues to suffer damages.

WHEREFORE, Plaintiff prays for judgment against the Defendant including: an award of damages, including back pay, front pay, actual, compensatory, and punitive, in an amount to be set by the jury; attorneys' fees and costs; interest thereon; and such other and further relief as to the Court deems meet and just.

## JURY DEMAND

Plaintiff hereby demands a jury on all claims so triable.

KIMBERLY HASHWAY

By Her Attorney,

ENRIGHT LAW LLC


/s/ Thomas J. Enright
Thomas J. Enright (#7356)
696 Reservoir Avenue
Cranston, RI 02910
(401) 526-2620
(401) 457-7117  FAX
tom@enrightlawoffice.com

DATED:  March 11, 2019